IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VERNON J. LEFTRIDGE,

　　*Plaintiff*,

v.                                    Civil Action No. ELH-11-3499

MICHAEL KELLY MATTHEWS, *et al.*,

　　*Defendants*.

## MEMORANDUM OPINION

Vernon J. Leftridge, Jr., the self-represented plaintiff,[1] has sued Sergeant Michael Kelly

Matthews, Deputy First Class ("DFC") Benjamin Charles Parsons, and Corporal Howard Lee

Bowden, all of whom are deputy sheriffs for Wicomico County, Maryland, asserting claims

arising from a traffic stop that occurred at around 4:00 a.m. on December 1, 2008, in Wicomico

County, Maryland.  Plaintiff was the driver of the vehicle and his brother, Sylvontae Bishop, was

the passenger.  During the stop, both men were frisked and the car was scanned by a drug

detection police dog.  Mr. Leftridge and Mr. Bishop are African American.  The defendant

deputies are white.

In his original Complaint (ECF 1), plaintiff asserted four counts: violation of 42 U.S.C.

§ 1981 (Count I); violation of the Fourth Amendment (Count II); violation of the Equal

Protection Clause of the Fourteenth Amendment (Count III); and a claim, which seems to be

duplicative of the others, alleging "racial profiling and racial harassment because of his race and

color, in violation of the 1866 Civil Rights Act and all applicable federal statutes that prohibits

---

[1] Because plaintiff is self-represented, his pleadings have been liberally construed.  *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

[sic] violation of rights while acting under color of law to the US Constitution" (Count IV). Complaint ¶ 18. Counts II, III, and IV all invoked the private right of action provided by 42 U.S.C. § 1983.

Plaintiff's Amended Complaint (ECF 64), which is the operative pleading, is not divided into counts, but purports to incorporate the original Complaint by reference. Accordingly, this Memorandum addresses the counts asserted in the original Complaint, as augmented by the allegations of the Amended Complaint. The Amended Complaint also purports to assert claims on behalf of Leftridge's brother, Bishop, as a "John Doe" plaintiff,[2] and against twelve John or Jane Doe law enforcement officer defendants.

The three named defendants have filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF 71), which has been fully briefed.[3] No hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I will construe the Motion as one for summary judgment and will grant it. Therefore, judgment will be entered in favor of the

---

[2] Although plaintiff purports to name Mr. Bishop as a "John Doe" plaintiff, Mr. Bishop is explicitly identified. For instance, in the caption of the Amended Complaint, he is listed as "John Doe (Sylvontae Bishop)." Amended Complaint at 1.

[3] I have considered the summary judgment motion with its supporting memorandum (ECF 71-1) (collectively, "Motion"); plaintiff's Opposition (ECF 73); and defendants' Reply (ECF 75). Plaintiff has also filed four other motions: a motion seeking a conference with the Court (ECF 77); a motion for leave to file a surreply (which did not include the proposed surreply or state a legitimate basis to file one) (ECF 78); a motion for extension of time to file a surreply (although leave for the filing of a surreply had not been granted) (ECF 81); and a motion to direct the defense to serve filings by certified mail (ECF 83). All four motions will be denied as lacking in merit.

Pursuant to *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), a letter was sent to plaintiff advising him that the Motion had been filed and that he had the right to submit evidentiary exhibits in support of his response to it. *See* ECF 72. Plaintiff actually filed his Opposition before the *Roseboro* letter was sent. He also filed affidavits in support of his Opposition, evincing his understanding of his right to respond to the Motion.

named defendants, and plaintiff's claims against the Doe defendants will be dismissed.

**Procedural History**

A. *Leftridge I*

This is the second lawsuit spawned by the traffic stop that occurred on December 1, 2008. In the first suit, *Bishop v. Lewis*, Civ. No. WMN-10-3640 (D. Md.) ("*Leftridge I*"), Mr. Leftridge and his brother, Mr. Bishop, both represented by counsel, sued the Maryland State Police ("MSP"), the "Wicomico County Sheriff's Office," and Mike Lewis, who is the Sheriff of Wicomico County. Sheriff Lewis was sued in both his individual and official capacities. The amended complaint in *Leftridge I* asserted substantially the same factual allegations as are asserted in this suit, and contained three counts: discrimination on the basis of race, in violation of the Civil Rights Act of 1866, codified as amended at 42 U.S.C. § 1981 (Count I); a claim under 42 U.S.C. § 1983, based on violations of the Fourth, Thirteenth, and Fourteenth Amendments (Count II); and a claim of racial discrimination by a recipient of federal financial assistance, in violation of Title VI of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. § 2000e *et seq. See* ECF 7 in *Leftridge I.*

On May 4, 2011, Judge William Nickerson granted motions to dismiss filed by the defendants in *Leftridge I* and dismissed the suit. *See Bishop v. Lewis*, Civ. No. WMN-10-3640, 2011 WL 1704755 (D. Md. May 4, 2011). He held that the "Wicomico County Sheriff's Office" was not a legal entity capable of being sued; that the § 1981 and § 1983 claims against the MSP and Sheriff Lewis in his official capacity were barred by Eleventh Amendment immunity; that Sheriff Lewis was not liable for violation of Title VI; and that the Title VI claims against the MSP and the § 1981 and § 1983 claims against Sheriff Lewis in his official capacity were

insufficiently pleaded.  *See id.*  Judge Nickerson's Order dismissing *Leftridge I* directed: "Plaintiffs shall file an amended complaint within ten days of the date of this Order, or the dismissal of the current Amended Complaint will be with prejudice." ECF 21 in *Leftridge I* (emphasis added).  Notably, the plaintiffs in *Leftridge I* did not file an amended complaint within ten days.  No further orders were issued in the case.

The docket in *Leftridge I* reflects that Mr. Leftridge, apparently without legal representation, attempted to file a second amended complaint in that case on October 14, 2011.  *See* ECF 22-1 in *Leftridge I*.  By letter of the same date, Judge Nickerson returned the second amended complaint to Mr. Leftridge, stating: "Case was ordered dismissed May 4, 2011, if plaintiffs did not file an amended complaint within 10 days of the date of the order."  ECF 22 in *Leftridge I*.

On December 2, 2011, plaintiff filed suit in this case.

### B.  Prior History of This Case

In his original Complaint in this case, plaintiff named Sergeant Matthews, Sheriff Lewis, and thirteen Doe defendants, one of which was a police dog and the others of whom were alleged to be law enforcement officers with the Wicomico County Sheriff's Department and the MSP.  All of the defendants were sued in their individual and official capacities.

Sheriff Lewis and Sergeant Matthews filed a Motion to Dismiss (ECF 18), arguing that suit was barred by the doctrine of res judicata, due to the previous dismissal of *Leftridge I*.  I granted the Motion to Dismiss in part and denied it in part.  *See* ECF 33 & 34.  In particular, I held that all claims against Sheriff Lewis and all of the official capacity claims against Sergeant Matthews and the Doe defendants were barred by res judicata.  I also dismissed all claims

against the Doe police dog, because dogs are not entities that can be sued under federal civil rights statutes. *See, e.g.*, *Dye v. Wargo*, 253 F.3d 296, 299-300 (7th Cir. 2001). However, pursuant to *Andrews v. Daw*, 201 F.3d 521 (4th Cir. 2000), and *Brooks v. Arthur*, 626 F.3d 194 (4th Cir. 2010), I concluded that the prior dismissal in *Leftridge I* was not res judicata as to the individual claims against Sergeant Matthews and the Doe defendants.[4]

Subsequently, I issued a Preliminary Scheduling Order (ECF 37) establishing a procedure for "limited preliminary disclosures" aimed at ascertaining the identities of the unidentified Doe defendants so as to enable plaintiff to file an amended complaint against all purported defendants. In letters of June 11, 2012 (ECF 48) and July 2, 2012 (ECF 53), defense counsel identified Sergeant Matthews and two other Wicomico County sheriff's deputies, Corporal Bowden and DFC Parsons, as the only law enforcement officers who had participated in the traffic stop. Corporal Bowden was the handler of the drug detection dog. In response, plaintiff insisted that more than three officers had participated in the traffic stop, but provided no factual basis for this assertion, such as descriptions of the Doe officers or allegations as to what particular actions each Doe officer took giving rise to liability. In an Order issued on July 20, 2012 (ECF 59), I cautioned Mr. Leftridge:

> If plaintiff maintains that more officers than the three identified by the defense participated in the traffic stop, he may identify those officers by "Doe" identities in his amended complaint, but must allege a factual basis for his allegation that each individual Doe officer was a participant in the traffic stop. Unparticularized

---

[4] Mr. Leftridge subsequently asked me to reconsider the ruling in part. *See* ECF 38. He argued that the dismissal in *Leftridge I* was not entitled to preclusive effect because his attorney did not provide competent representation. I denied that request, observing that a challenge to the final judgment in *Leftridge I* ought to be resolved by motion filed in *Leftridge I* under Fed. R. Civ. P. 60. *See* ECF 39. Mr. Leftridge then filed a Rule 60 motion in *Leftridge I*, which Judge Nickerson denied. *See Bishop v. Lewis*, Civ. No. WMN-10-3640, 2012 WL 3903497 (D. Md. Sep. 6, 2012).

claims against a "laundry list" of Doe officers may lead to dismissal for failure to state claims upon which relief can be granted.

Thereafter, plaintiff filed his Amended Complaint, and the named defendants filed the pending Motion.

<h2 style="text-align:center">Factual Background[5]</h2>

In the early morning hours of December 1, 2008, Mr. Leftridge and Mr. Bishop were driving northbound on Maryland Route 13, en route to Connecticut, where Mr. Leftridge resides. The brothers were traveling from their father's home in Virginia Beach, Virginia, where they had

---

[5] The facts recited in this section are drawn from the exhibits submitted by the parties. Unless otherwise noted, the facts are undisputed. Moreover, I have construed the facts in the light most favorable to Mr. Leftridge as the non-moving party. *See* "Standard of Review," *infra.*

The facts in this section are primarily derived from a DVD containing a video of the traffic stop, which was recorded by a dashboard video camera mounted in Sgt. Matthews' police vehicle (the "Video"), submitted as Exhibit A to the Motion. *See* ECF 71-2. As Judge Diana Motz explained in *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272 (4th Cir. 2011), "when a video 'quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt [the plaintiff's] version of the facts for purposes of ruling on a motion for summary judgment.'" *Id.* at 276 (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). However, this principle does not license a court to "reject a plaintiff's account on summary judgment" if the "documentary evidence, such as a video," merely "offers *some* support for a governmental officer's version of events." *Witt*, 633 F.3d at 276 (emphasis in original).

Accordingly, to the extent that the Video clearly depicts the events at issue, it will prevail over contrary evidence submitted by either side. However, to the extent that the Video is unclear or ambiguous, the Court must adopt plaintiff's version of events for purposes of the Motion. In referring to events that the Video depicts, I use the present tense, describing the events as they appear to occur to a viewer of the Video.

Other exhibits in the record include an affidavit of Sgt. Matthews ("Matthews Aff."), *see* Ex.B to Motion (ECF 71-3); an affidavit of Cpl. Bowden ("Bowden Aff."), *see* Ex.C to Motion (ECF 71-4); an audio recording of radio transmissions over the Wicomico County Sheriff's Office radio dispatch system on the night of the traffic stop ("Dispatch Recording"), *see* Ex.D to Motion (ECF 71-2); an affidavit of DFC Parsons ("Parsons Aff."), *see* Ex.E to Motion (ECF 71-5); an affidavit of Mr. Leftridge ("Leftridge Aff."), *see* ECF 73-3; an affidavit of Sylvontae Bishop ("Sylvontae Bishop Aff."), *see* ECF 60; and an affidavit of Sylvester Bishop, Jr., who is the father of Mr. Leftridge and Sylvontae Bishop and a Virginia law enforcement officer ("Sylvester Bishop Aff."), *see* ECF 73-4.

just spent the Thanksgiving holiday. Mr. Bishop, who resides in Virginia Beach, was accompanying his brother with the intention of enrolling in a community college in Connecticut. *See* Sylvontae Bishop Aff. ¶ 3. Mr. Leftridge was driving the vehicle, a four-door Acura owned by his father, Sylvester Bishop.

According to Sgt. Matthews' affidavit, he effectuated the stop of Mr. Leftridge's vehicle at 3:57 a.m. on December 1, 2008. Matthews Aff. ¶ 2. The Video of the traffic stop begins with Sgt. Matthews' vehicle driving northbound along Route 13, which is a three-lane divided highway with traffic lights. At first, the Video has no sound. Approximately 45 seconds in to the Video, Sgt. Matthews' vehicle approaches a red light in the left lane. In the middle lane (one lane to the right of Sgt. Matthews' vehicle) and ahead of Sgt. Matthews' car is the four-door automobile that Mr. Leftridge is driving, braking as it approaches the red light. Mr. Leftridge's vehicle comes to a complete stop at the light. The Video clearly shows that Mr. Leftridge's left brake light is not functioning. The brake lights on the right and in the center of the rear windshield are much brighter than the left light, in which only the bulb for the running light is active.[6] When Sgt. Matthews' car is approximately three car lengths back from the light, the light turns green. Mr. Leftridge's vehicle starts moving forward, while Sgt. Matthews' vehicle continues to brake, such that Sgt. Matthews' vehicle momentarily pulls even with Leftridge's and then Leftridge's vehicle again pulls ahead. As Leftridge's vehicle moves forward, Sgt. Matthews activates his emergency lights, which also activates the audio recorder for the Video,[7]

---

[6] In his affidavit, Mr. Bishop alleges that the contention that the brake light did not work is "untrue because [Bishop] personally check[ed] all of the lights . . . before we got on the road to Connecticut." Sylvontae Bishop Aff. ¶ 7. This assertion is plainly contradicted by the Video.

[7] Although the Video contains sound from this point forward, much of what is said in the Video is not clearly audible due to the speakers' distance from the microphone(s) and the noise

and pulls into the center lane behind Leftridge.

Leftridge promptly brakes (at which time it is again evident that his left brake light is not functioning properly), activates his right turn signal, and merges into the right lane and then onto the shoulder. Sgt. Matthews follows him and, at approximately one minute and thirty seconds into the Video, both cars come to a stop on the right shoulder. Sgt. Matthews can be heard on the Video informing dispatch of the license plate number, make, and color of Mr. Leftridge's vehicle and their location.

In his affidavit, Sgt. Matthews avers that he "initiated the traffic stop because [he] observed that the subject vehicle's left rear brake light was not functioning properly." Matthews Aff. ¶ 3. He states: "At the time I determined the violation warranted a traffic stop, I had no knowledge of the race of the occupants of the subject vehicle, and in fact, thought there was only one occupant of the vehicle." *Id.* ¶ 4. Both Sgt. Matthews and DFC Parsons state in their affidavits that DFC Parsons was driving his patrol vehicle behind Sgt. Matthews' vehicle at the time Sgt. Matthews initiated the stop, and that DFC Parsons pulled his vehicle in behind Sgt. Matthews' vehicle at the time of the stop. *Id.* ¶ 5; Parsons Aff. ¶¶ 3-4. In contrast, Mr. Leftridge claims that there was no other vehicle behind Matthews' vehicle at the time of the stop. Leftridge Aff. ¶ 12. This discrepancy is not material.

In any event, the Video shows Sgt. Matthews exiting his vehicle and approaching Mr. Leftridge's vehicle on the passenger side. Matthews speaks with the occupants of the car for about two and a half minutes, but the conversation is not audible on the Video. Matthews then walks back to his vehicle. In his affidavit, Sgt. Matthews states that he "observed that both

---

from passing traffic.

occupants of the subject vehicle appeared unusually nervous."  Matthews Aff. ¶ 6.  He also states that the occupants "provided an inconsistent description of the purpose of their trip," *id.*, although he does not explain the nature of the inconsistency, and states that the "driver appeared to be attempting to direct the passenger's responses to my questions."  *Id.*  In his affidavit, Mr. Leftridge vehemently denies that he or Mr. Bishop appeared nervous or provided inconsistent information.  *See* Leftridge Aff. ¶¶ 12-13.

Somewhat later in the Video, Matthews can be heard telling another officer that Mr. Leftridge and Mr. Bishop

> seem pretty nervous.  They don't have registration for the vehicle, guy says it's his dad's.[8]  They say that they're brothers, but there's two different last names.  One's from Connecticut, one's from Virginia.  They said they were going up, dropping him off at school.  I said, which school?  He says, oh, I'm not in school yet, I'm going to start school.  Video at 11:20.

In his affidavit, DFC Parsons states that, as Matthews walked back to his vehicle, Matthews advised Parsons that he was requesting a canine scan of the vehicle.  Parsons Aff. ¶ 5.  Matthews requested a canine unit at 4:00 a.m.  *See* Dispatch Recording at 4:00 a.m.  Matthews then provided the radio dispatcher with the names, birthdates, and drivers' license numbers of Mr. Leftridge and Mr. Bishop so that a license and registration check could be performed.  *See id.* at 4:02 a.m.

Cpl. Bowden, the K-9 officer, arrived on the scene at approximately 4:05 a.m.  *See* Bowden Aff. ¶  The Video shows his police cruiser arriving approximately nine minutes and 45 seconds into the Video (*i.e.*, eight minutes after the traffic stop began).  At about the same time, the dispatcher reported back that a license and registration check turned up no unusual

---

[8] The vehicle did, in fact, belong to Sylvester Bishop, plaintiff's father.  *See* Sylvester Bishop Aff. ¶ 5; Sylvontae Bishop Aff. ¶ 3.

information regarding the vehicle or either occupant, except that Mr. Bishop's Virginia driver's license was suspended. Dispatch Recording at 4:05 a.m. As noted, Mr. Leftridge was the driver of the vehicle.

According to Cpl. Bowden, Sgt. Matthews was working on the paperwork related to the traffic stop when Bowden arrived. Bowden Aff. ¶ 4; *see also* Matthews Aff. ¶ 10 ("When . . . Bowden arrived, I had not yet completed the paperwork associated with the traffic investigation."). In the Video, Bowden advises Matthews that he is going to remove Leftridge and Bishop from the vehicle so that he can perform the canine scan. Matthews asks Bowden to "do the pat down." Video at 11:50.

Cpl. Bowden and DFC Parsons approach plaintiff's vehicle on both sides and direct Mr. Leftridge and Mr. Bishop to exit the vehicle and place their hands on the hood of Matthews' car so that they can be patted down. The simultaneous pat down of Leftridge and Bishop is clearly visible, taking place directly in front of the video camera.

In their affidavits, Mr. Leftridge and Mr. Bishop describe the pat down as a "strip search," Leftridge Aff. ¶ 26; Sylvontae Bishhop Aff. ¶ 3, an "entire body search[ ]," Leftridge Aff. ¶ 27, or "full body search[ ]," Sylvontae Bishop Aff. ¶ 4, and even as a "sexual assault[ ]." Sylvontae Bishop Aff. ¶ 8; *see also id.* ("the law enforcement officers . . . kept grabbing our private body parts"); Leftridge Aff. ¶ 25 ("Defendants had 'grabbed' [sic] plaintiff and his brothers [sic] penis during the caution [sic] shocking searches . . . ."). The Video clearly contradicts these characterizations. Although Mr. Leftridge and Mr. Bishop understandably appear uncomfortable with being patted down, the Video shows nothing outside the bounds of a thorough, professional pat down of the exterior of both men's clothing, lasting approximately

one minute.

After the pat down, the officers direct Leftridge and Bishop to stand off to the right of Matthews' vehicle. Cpl. Bowden then returns to his car to retrieve his drug detection dog, Rocket, a German Shepherd. According to Bowden, Rocket is "trained to alert at the odor of marihuana, concaine, heroin, and methamphetamine." Bowden Aff. ¶ 3. The Video shows that, as Bowden walks Rocket to the trunk of plaintiff's vehicle, the dog barks in the direction of Leftridge and Bishop. Although Mr. Bishop suggests that the officers induced the dog to bark at him and Mr. Leftridge, *see* Sylvontae Bishop Aff. ¶ 5, the Video clearly shows that Bowden immediately redirects the dog's attention, and one of the other officers can be heard explaining to Leftridge and Bishop that the dog is trained to bark. Video at 16:00. In his affidavit, Cpl. Bowden also states that it is not "unusual" for Rocket to bark, noting that "Rocket is dual-trained to perform patrol duties as well as scans for narcotics" and that he "barks in similar circumstances upon coming into view of other individuals whether they are citizens or other law enforcement officers." Bowden Aff. ¶ 9.

At sixteen minutes into the Video (*i.e.*, about fourteen minutes into the traffic stop), Bowden begins walking Rocket around the perimeter of plaintiff's car. Rocket completes two passes around the vehicle. According to Cpl. Bowden, Rocket "alerted" to the odor of a controlled dangerous substance two times, at the driver's door on both passes, by "showing a behavioral change and sitting." Bowden Aff. ¶ 11. The alerts cannot be seen on the Video because the camera's view of Rocket is obstructed when the dog is at the driver's door of plaintiff's vehicle. Nevertheless, neither Leftridge nor Bishop disputes that the dog alerted. As shown on the Video, the dog scan lasts approximately one minute and ten seconds, after which

Bowden returns Rocket to his vehicle.

One of the officers then informs Leftridge and Bishop that the dog alerted and asks a few questions regarding whether either brother uses any illegal drugs. Leftridge and Bishop both deny any use of drugs. The officers then inform Leftridge and Bishop that, due to the dog alert, they will perform a search of the vehicle and another pat down. The search of the vehicle lasts approximately eighteen minutes. During the start of the search, Leftridge and Bishop are patted down again. The second pat down of Bishop can be seen on the Video; it is more thorough than the first search, but it still lasts just over a minute. The officer who pats Bishop down reaches into Bishop's pockets and inside his jacket. However, nothing in that pat down could objectively be described as a strip search or a sexual assault. Moreover, Bishop readily moved his hands as the search was conducted. Leftridge's pat down is not in the field of vision of the camera, but there is no indication that it differed in any significant way from the pat down Bishop received.

Following the conclusion of the vehicle search, Sgt. Matthews states to Leftridge and Bishop that he found what he suspects is marijuana "shake" on the floor of the car, which Matthews describes to Leftridge and Bishop as excess marijuana leaf that might fall to the ground while a user is attempting to pack a marijuana "blunt" or cigar. Video at 35:50 – 37:00. Both Leftridge and Bishop deny that they use marijuana, although they acknowledge that another family member, who smokes cigarillos, has used the vehicle recently.[9]

---

[9] In his affidavit, Matthews clarifies that he found "only a very small amount of marijuana leaf on the floor of the vehicle near the driver's side door," but that there was "noticeable cigar tobacco loose on the floor board," which Matthews claims "is indicative of marijuana use." Matthews Aff. ¶ 14. Sylvester Bishop, plaintiff's father, avers that he is a Virginia state law enforcement officer of nineteen years' experience and that his vehicle "did not contain any controlled substance on said date as I personally inspected [the] vehicle in its entirety before my sons['] travel to Connecticut after my sons['] holiday visit for the

At this point in the Video, Sgt. Matthews thanks Leftridge and Bishop for their time and advises Leftridge that he is giving him a written warning regarding the "left stop lamp." Leftridge asks Matthews to clarify whether the problem is with the "brake light" or the "tail light." Matthews confirms that it is the brake light and asks one of the other officers to demonstrate the problem by depressing the brake pedal of the vehicle while Leftridge observes from the rear of the car; the failure of the left brake lamp to illuminate is again clearly visible. Matthews then wishes Leftridge and Bishop a "safe trip" and shakes both men's hands. Leftridge and Bishop get back in their car and the traffic stop concludes at 38:15 on the Video, approximately 37 minutes after it began.

## Discussion

As their lead argument, defendants urge the Court to dismiss plaintiff's claims with prejudice as a sanction for what they regard as plaintiff's outlandish and demonstrably false allegations that plaintiff has made both in connection with the merits of the suit and in various procedural disputes during the case thus far, including claims of sexual assault, and claims that the defense is making intentional misrepresentations to the court and engaging in other procedural chicanery. Defendants rely on Fourth Circuit precedent stating: "When a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process, the court has the inherent power to dismiss the action." *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993). I decline defendants' invitation to dismiss this case as a litigation sanction. In light of plaintiff's self-represented status and the Fourth Circuit's "strong preference that . . . claims and

Thanksgiving Holiday Dinner." Sylvester Bishop Aff. ¶ 10.

defenses be disposed of on their merits," *Colleton Prep. Acad., Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010), I will resolve the Motion on the merits.

## A. "Doe" Parties

As a preliminary matter, all claims on behalf of or against "Doe" parties will be dismissed. As to Mr. Bishop, he did not sign the Amended Complaint and thus any claims on his behalf are not properly before the Court. This district's Local Rule 101.1(a) states: "Individuals who are parties in civil cases may only represent themselves." Local Rule 102.1(a)(ii) provides that, "[w]hen a party is appearing without counsel, the Clerk will accept for filing only documents signed by that party." These rules are not idiosyncratic to this Court. Rather, such rules are virtually ubiquitous precautions against the practice of law by persons who are not licensed as attorneys-at-law, who attempt to represent others in judicial proceedings. Designating Mr. Bishop as a "John Doe Plaintiff" does not cure this defect. Accordingly, to the extent that Mr. Leftridge asserts claims on behalf of Mr. Bishop, those claims will be dismissed. I note, however, that if Mr. Bishop's claims were properly before me, they would fail on the merits for the same reasons that Mr. Leftridge's claims on his own behalf cannot succeed.

As to the Doe defendants, Mr. Leftridge was specifically cautioned that the Court would not accept a "laundry list" of unparticularized claims against unspecified Doe defendants. Yet, the Amended Complaint fails to comply with the Court's instructions. To be sure, as to each Doe defendant, plaintiff has indicated where the defendant is employed. Three of the Doe defendants are Wicomico County "Internal Affairs Officer[s]"; four are Wicomico County "Over-the-Air Communication Officer[s]" or "Dispatch Officer[s]"; two are "Maryland State Trooper[s]"; two are "Salisbury Police Officer[s]"; and one is a Wicomico County "K-9

Officer." Nevertheless, the Amended Complaint contains no averments as to what each particular Doe defendant allegedly did as a basis for liability.

In particular, the Amended Complaint utterly fails to describe what role, if any, Maryland State troopers, Salisbury police officers, or a second K-9 officer played in the traffic stop. Mr. Leftridge has consistently maintained that several additional officers, including at least one State trooper, participated in the traffic stop, yet the Video shows only Matthews, Parsons, and Bowden as participants. However, even if the Video is insufficient to dispel plaintiff's claim, plaintiff has failed to describe each of these defendant Doe officers and their alleged actions with sufficient detail to enable them to be identified. Moreover, to the extent that any of the Does are alleged to be participants on the scene of the traffic stop, any claims against them would fail on the merits for the same reasons that plaintiff's claims cannot succeed against the named defendants.

As to the "Over-the-Air Communication Officer[s]" and "Dispatch Officer[s]," the Amended Complaint fails to describe what such officers could possibly have done or failed to do so as to incur liability. Thus, all claims against those officers will be dismissed.

As to the Internal Affairs officers, the Amended Complaint conceivably contains sufficient detail to determine the identities of the officers. Plaintiff argues that Wicomico County Sheriff's Office Internal Affairs investigators failed to investigate his complaints of a racially motivated arrest. However, no such allegations were contained in plaintiff's original Complaint in this action; any suggestions of impropriety in the internal investigations made their debut in the Amended Complaint. As such, the claims are clearly time-barred.

The stop at issue occurred on December 1, 2008, and, according to Mr. Bishop, he and Mr. Leftridge filed Internal Affairs complaints "immediately" thereafter. Sylvontae Bishop Aff. ¶ 10. Plaintiff's Amended Complaint was not filed until September 6, 2012, over three years and nine months after the incident. Sections 1981 and 1983 of 42 U.S.C., upon which plaintiff's claims rely, ordinarily borrow the general or "residual" statute of limitations governing unenumerated intentional torts in the state where the cause of action arose. *See Wallace v. Kato*, 549 U.S. 384, 389 (2007) (concerning § 1983); *Owens v. Okure*, 488 U.S. 235, 236 (1989) (same, citing and expanding upon rule announced in *Wilson v. Garcia*, 471 U.S. 261 (1985)); *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987) (concerning § 1981). In Maryland, that statute of limitations is generally three years. *See* Md. Code (2013 Repl. Vol.), § 5-101 of the Courts & Judicial Proceedings Article; *see also Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999) (stating that claims under § 1983 "borrow the state's general personal injury limitations period, which in Maryland is three years").[10]

An argument can be made that claims against "Doe" officers who participated in the traffic stop should relate back to the date of plaintiff's original Complaint. *See, e.g.*, *McDaniel v. Maryland*, Civ. No. RDB-10-189, 2010 WL 3260007, at *5 (D. Md. Aug. 18, 2010) (holding that

---

[10] The scope of liability under § 1981 was expanded by the Civil Rights Act of 1991 to prohibit racial discrimination in an ongoing contractual relationship, in addition to discrimination in the formation of a contract. *See generally CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 449-51 (2008) (discussing enactment of § 1981(b) in response to *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989)). Accordingly, the Fourth Circuit has held that, with respect to claims of post-contract-formation discrimination under § 1981, courts should apply the four-year statute of limitations in 28 U.S.C. § 1658 (which establishes the limitations period for all federal causes of action created after December 1, 1990, that do not contain their own limitations provision), rather than the borrowed state-law statute of limitations (which, in Maryland, is three years). *See James v. Circuit City Stores, Inc.*, 370 F.3d 417, 420-21 (4th Cir. 2004). However, this case does not involve claims of discrimination in an ongoing contractual relationship.

claims against officer related back to earlier "John Doe" pleading where defendants "had the means and ability to identify the John Doe officer, especially since his role [was] described in the Complaint and he [was] allegedly depicted in the audiovisual recording of the events"). No such argument is available with respect to the Internal Affairs officers, however, because no misconduct of Internal Affairs officers was alleged in the original Complaint.

In any event, even if the claims were not time-barred, they would fail to state a claim upon which relief can be granted. This is because private citizens have no constitutional or other right to a criminal investigation, nor any judicially-cognizable interest in the prosecution or non-prosecution of another. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

Accordingly, I will dismiss all claims against the Doe defendants.

## B. Standard of Review (as to the Remaining Parties)

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "or in the alternative" for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

When, as here, the movants expressly caption their motion "in the alternative" as one for summary judgment, and submit matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[11] In this case, defendants captioned their Motion alternatively as a motion to dismiss or for summary judgment, which is essentially a formality; the Motion relies extensively on matter outside the pleadings, particularly the Video.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2012 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont*, *supra*, 637 F.3d at 448-49. However, "the

---

[11] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Fisher v. Md. Dept. of Pub. Safety & Corr. Servs.*, Civ. No. JFM-10-0206, 2010 WL 2732334, at *3, 2010 U.S. Dist. LEXIS 68772, at *8-10 (D. Md. July 8, 2010).

party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)). If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit acts at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Id.* at 244 (citations omitted).

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)). "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat

summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Harrods*, 302 F.3d at 244 (internal citations omitted). Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted). Thus, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

In this case, plaintiff has not filed a Rule 56(d) affidavit, and he has responded to the matter outside the pleadings presented by defendants with extrinsic matter of his own. Specifically, he has filed his own affidavit and the affidavits of his father and brother. Moreover, the primary item of evidence outside the pleadings upon which my ruling turns—the Video—is by its nature not readily susceptible to contradiction by additional evidence that could be gained in discovery. To the extent that the Video clearly depicts the events at issue, governing Supreme Court and Fourth Circuit cases, discussed *supra*, provide that a party cannot generate a dispute of material fact simply by presenting an alternative version of events in a sworn statement or testimony. If my review of the Video left substantial areas of factual uncertainty, conversion

under Rule 12(d) might not be warranted. But, in this case, the Video is dispositive of virtually all of the genuinely material facts. Accordingly, I will exercise my discretion to consider the Motion under a summary judgment standard.

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In resolving a motion for summary judgment, a district court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *News and Observer Publishing Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'" showing that there is a triable issue. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The district court's "function" in resolving a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248. In contrast, a court must

award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

## C.  Substantive Claims

Although plaintiff presents four counts, his claims boil down to two: (1) defendants violated his Fourth Amendment rights by subjecting him to an unreasonable seizure and search; and (2) defendants discriminated against him on the basis of race by initiating the traffic stop on the basis of racial profiling.  I will first address the Fourth Amendment claim, which is the subject of Count II of the original Complaint, as incorporated into the Amended Complaint.  The racial discrimination claims under § 1981 and the Equal Protection Clause of the Fourteenth Amendment, which are the subject of Counts I, III, and IV, can be addressed together.  I pause to note that § 1983 is the vehicle both for plaintiff's Fourth Amendment claims and for his Fourteenth Amendment claims.  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

### 1.  Fourth Amendment

The Fourth Amendment guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  By its text, the Fourth Amendment applies only to the federal government, but in *Wolf v. Colorado*, 338 U.S. 25, 27-28 (1949), the Supreme Court held that "[t]he security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is . . . implicit

in 'the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause" of the Fourteenth Amendment. Therefore, state officers must comport with the requirements of the Fourth Amendment. Section 1983 provides a damages remedy for violations of the Fourth Amendment. *See, e.g.*, *Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("§ 1983 allow[s] a plaintiff to seek money damages from government officials who have violated his Fourth Amendment rights.").

By its plain text, the Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *see Whren v. United States*, 517 U.S. 806, 809-10 (1996); *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990); *United States v. Sharpe*, 470 U.S. 675, 682 (1985); *United States v. Mendenhall*, 446 U.S. 544, 551 (1980). The "test of reasonableness under the Fourth Amendment is an objective one." *Los Angeles County v. Rettele*, 550 U.S. 609, 614 (2007) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). What the Supreme Court said in *Rodriguez*, 497 U.S. at 185, is salient:

> [I]n order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable.

"The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)); *see United States v. Sowards*, 690 F.3d 583, 587-88 (4th Cir. 2012). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable'

under the circumstances." *Whren*, 517 U.S. at 810. "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008), *cert. denied*, 555 U.S. 1118 (2009).

In *Whren*, the Supreme Court held that a traffic stop is not "rendered invalid by the fact that it was 'a mere pretext for a narcotics search,'" so long as the officer reasonably believed that the motorist had violated the traffic code. *Whren*, 517 U.S. at 813. This is because Fourth Amendment reasonableness is an objective determination, which does not "depend[ ] on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.*

To be sure, the *Whren* Court observed that pretextual bases for traffic stops might violate provisions of the Constitution other than the Fourth Amendment. The Court said: "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren*, 517 U.S. at 813. But, it explained, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Id.* Accordingly, plaintiff's claim that the deputies stopped his vehicle on the basis of his race is not relevant to his Fourth Amendment claim. In Fourth Amendment litigation, a party "will not be heard to complain that although he was speeding the officer's real reason for the stop was racial harassment." *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 1416 (2013). Rather, the question to be resolved under the Fourth Amendment is whether a reasonable officer would objectively have been entitled to undertake the traffic stop and the subsequent search of plaintiff's vehicle.

The linchpin of the Fourth Amendment is objective reasonableness. *See Maryland v. Wilson*, 519 U.S. 408, 411 (1997); *United States v. Bumpers*, 705 F.3d 168, 171 (4th Cir. 2013). "Reasonableness . . . depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" *Pennsylvania v. Mimms*, 934 U.S. 106, 109 (1977) (citation omitted). *See United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011) (analyzing propriety of a traffic stop).

Although an officer's subjective motivation for initiating a traffic stop is irrelevant to Fourth Amendment analysis, in order to effect a lawful stop of a vehicle, an officer must have either probable cause or, at the very least, a reasonable, articulable suspicion, supporting a belief that the motorist is violating the law.[12] Conversely, a traffic stop violates the Fourth Amendment when there is no "reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable laws." *Prouse*, 440 U.S. at 650. In other words, under *Whren*, an officer who observes a suspected traffic violation may effect a traffic stop, even if the officer's subjective motivation for the stop is not the traffic violation itself, but the hope that the stop will lead to the discovery of evidence of some other

---

[12] The "reasonable suspicion" standard derives from *Terry v. Ohio*, 392 U.S. 1 (1968). There, the Supreme Court held that a police officer may briefly detain a person "for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest," *id.* at 22, so long as the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. The reasonable suspicion standard requires the police to possess "a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted). It is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). On the other hand, the standard requires more than a mere "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27; *accord United States v. Sokolow*, 490 U.S. 1, 7 (1989).

crime. But, this does not mean that an officer may initiate a stop without actually having observed a suspected violation.

There can be no dispute that Sgt. Matthews' initiation of the traffic stop comported with the Fourth Amendment. It is obvious from the Video that plaintiff's left brake light was not functioning properly. Under Md. Code (2012 Repl. Vol., 2013 Supp.), § 22-219(a)(2)-(3) of the Transportation Article ("Transp."),[13] a motor vehicle's stop lamps "[s]hall be actuated on application of the service (foot) brake" and "[m]ay, but need not, be incorporated with one or more other rear lamps." Under Transp. § 22-101(a)(1)(ii), a person may not drive a vehicle that "is not at all times equipped with lamps and other equipment in proper condition and adjustment . . . ." Sgt. Matthews' observation of plaintiff's inoperable brake light, as shown on the Video, provided ample probable cause to conduct a traffic stop.

Once Sgt. Matthews stopped plaintiff's vehicle, his inquiries to Mr. Leftridge and Mr. Bishop did not render the seizure unreasonable. The "law has become well established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). Moreover, the Supreme Court "has made plain" that an "officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citing *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005)); *see also United States v. Guijon-Ortiz*, 660 F.3d 757, 765 (4th Cir. 2011) (stating that an officer may, "'in the interest of personal safety,' request that the

---

[13] Although I cite the current codification of the statute, the relevant provisions have not been amended since the occurrence of the traffic stop at issue here.

passengers in the vehicle provide identification, at least so long as the request does not prolong the seizure"); *United States v. Mason*, 628 F.3d 123, 131 (4th Cir. 2010), *cert. denied*, 132 S. Ct. 329 (2011).

This leads to the next event of Fourth Amendment significance that occurred during the traffic stop: Sgt. Matthews' call for a drug detection K-9 unit to respond to the scene. In *Illinois v. Caballes*, 543 U.S. 405 (2005), the Supreme Court held that "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests." *Id.* at 409. According to the Court, when a "dog sniff [is] performed on the exterior of [a] car while [it is] lawfully seized for a traffic violation," any "intrusion on [the driver's] privacy expectations does not rise to the level of a constitutionally cognizable infringement." *Id.*[14]

However, the rule articulated in *Caballes* comes with a catch: "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* at 407. When considering the reasonableness for Fourth Amendment purposes of a traffic stop in which officers utilize a drug detection dog, a court must determine whether the "duration of the stop" was "justified by the traffic offense and the ordinary inquiries incident to such a stop." *Id.* at

---

[14] To be sure, the Supreme Court made clear last term that this does not mean that a dog sniff can never constitute a search within the meaning of the Fourth Amendment. In *Jardines*, *supra*, ___ U.S. ___, 133 S. Ct. 1409, the Court rejected the notion that "investigation by a forensic narcotics dog by definition cannot implicate any legitimate privacy interest," *id.* at 1417, and held that the "government's use of trained police dogs to investigate the home and its immediate surroundings [*i.e.*, the home's 'curtilage'] is a 'search' within the meaning of the Fourth Amendment." *Id.* at 1417-18. The case *sub judice* involves a sniff of the exterior of a vehicle during a lawful traffic stop, as in *Caballes*, rather than a sniff within the curtilage of a home, as in *Jardines*.

408.  In *Caballes*, the Supreme Court "assume[d]" that "a dog sniff that occurred during an unreasonably prolonged traffic stop" would violate the Fourth Amendment.  *Id.*

"The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision," however.  *Branch*, 537 F.3d at 336.  "Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose."  *Id.*; *see also Untied States v. McBride*, 676 F.3d 385, 394 (4th Cir. 2012); *Guijon-Ortiz*, 660 F.3d at 765.

As Judge Charles E. Moylan, Jr. memorably explained for the Maryland Court of Special Appeals: "[T]he use of a drug-sniffing canine [is] an effective investigative tool if the police can squeeze it in before the buzzer sounds . . . ."  *State v. Ofori*, 170 Md. App. 211, 238, 906 A.2d 1089, 1104, *cert. denied*, 396 Md. 13, 912 A.2d 649 (2006).  "Using a dog is accepted as a perfectly legitimate utilization of a free investigative bonus as long as the traffic stop is still genuinely in progress."  *Id.* at 235, 906 A.2d at 1102.  But, "[o]nce the traffic-related purpose of the stop has been served, any detention based on the traffic stop should terminate and the stopee should be permitted to leave the scene immediately. Once a traffic stop is over, there is no waiting for the arrival, even the imminent arrival, of the K-9 unit."  *Id.*[15]

---

[15] To be sure, if in the course of the traffic stop, an officer develops reasonable suspicion of a narcotics violation, the officer may reasonably extend the traffic stop further (on the basis of the additional reasonable suspicion) to allow a K-9 unit to arrive.  *See, e.g.*, *Branch*, *supra*, 537 F.3d at 337-40; *see id.* at 339 ("[T]o the extent that Branch was detained beyond the reasonable length of a traffic stop, Officer White possessed a "reasonable articulable suspicion of narcotics activity" sufficient to justify the [30-minute] continued detention.").  In the context of the decision to initiate a drug dog scan of the vehicle, I need not consider whether the officers here had reasonable suspicion to extend the traffic stop.  This is because the detention was not extended beyond the reasonable scope of a routine traffic stop.

In this case, the undisputed evidence, including the Video and the Dispatch Recording, establishes that Cpl. Bowden arrived with his drug detection dog only eight minutes after the traffic stop began, at a time when Sgt. Matthews had only just received a report from dispatch regarding a license and registration check and was still completing the paperwork related to the traffic stop. While Matthews continued to work on the paperwork, the other deputies removed the occupants from the vehicle, patted them down, and conducted the dog scan of the vehicle. The dog scan lasted just over one minute and the dog alerted to the alleged odor of a controlled dangerous substance within fifteen minutes after the traffic stop began. Those undisputed facts place this case comfortably within the mine run of cases in which courts have held that a traffic stop was not unreasonably prolonged to allow a drug dog scan. *See, e.g.*, *United States v. Stubblefield*, 682 F.3d 502, 506 (6th Cir. 2012) (holding that use of drug detection dog did not unreasonably prolong stop where K-9 officer wrote speeding ticket, gave ticket to other officer to explain to driver, and then immediately conducted dog scan while explanation was being given, where less than five minutes passed between request for identification and issuance of ticket, and dog scan did not delay issuing ticket); *United States v. Roach*, 477 F. App'x 993, 1000 (4th Cir. 2012) (holding that officers did not "unreasonably prolong[ ] the stop to await the narcotics-detection dog," where "dog arrived within approximately two minutes of the initiation of the stop"); *United States v. Brown*, 222 F. App'x 652, 653 (9th Cir. 2007) ("[T]he time that elapsed from the beginning of the traffic stop to when the K9 . . . alerted to the presence of drugs was only 11 or 12 minutes, not 'beyond the time reasonably required' to issue a ticket. The . . . police officer was, in good faith, just finishing writing the ticket when the K9 unit arrived, and . . . the dog sniff was completed within the next minute or two."); *United States v. Williams*, 429

F.3d 767, 772 (8th Cir. 2005) ("[T]he brief five to six minute wait for the drug-sniffing dog is well within the time frame for finding that the stop was not unreasonably prolonged.").

Notably, although plaintiff complains that he and Bishop "were ordered to exit the vehicle against there [sic] consent," and that there was "no probable cause to force [Leftridge and Bishop] out of the vehicle," Leftridge Aff. ¶ 15, neither probable cause nor reasonable suspicion is necessary to order the occupants out of a motor vehicle that is subject to a traffic stop. Rather, an order "to leave the vehicle [is] a non-event for Fourth Amendment purposes." *McDaniel v. Arnold*, 898 F. Supp. 2d 809, 837 (D. Md. 2012). "'[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.'" *Ohio v. Robinette*, 519 U.S. 33, 38-39 (1996) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam)); *see also Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (extending *Mimms* to passengers and holding that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop").

The closest Fourth Amendment issue presented by this factual scenario is the deputies' decision to pat down Leftridge and Bishop immediately after ordering them to exit the vehicle. A pat down or a so-called "*Terry* frisk" is a protective frisk, "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, *supra*, 392 U.S. at 29. Under *Terry*, if an officer conducting an investigatory stop has "reasonable fear for his own or others' safety," *id*. at 30, the officer may conduct a *Terry* frisk: "a reasonable search for weapons for the protection of the police officer, where [the officer] has reason to believe that he is dealing with an armed and dangerous individual, regardless of

whether he has probable cause to arrest the individual for a crime." *Id.* at 27. As the Supreme Court has said, a "policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." *Adams v. Williams*, 407 U.S. 143, 146 (1972). Nevertheless, a *Terry* frisk can only be used to search for weapons on the basis of a reasonable suspicion that the person frisked may be armed and dangerous; a *Terry* frisk is not justified based merely on a suspicion that the person to be frisked might possess narcotics or other contraband. *See Sibron v. N.Y.*, 392 U.S. 40, 63-66 (1968). Put another way, the purpose of a *Terry* frisk is "not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams*, 407 U.S. at 146.

Defendants have not pointed to any evidence in the record that is directly suggestive of an apparent physical danger presented by either Leftridge or Bishop. However, they argue that the officers had a reasonable, articulable suspicion that Leftridge and Bishop were engaged in trafficking of controlled substances and, on this basis, argue that the *Terry* frisk was justified. They rely on a single case: *United States v. Sakyi*, 160 F.3d 164 (4th Cir. 1998).

In *Sakyi*, the Fourth Circuit attempted to reconcile the Supreme Court's decisions in *Mimms*, 434 U.S. 106, and *Wilson*, 519 U.S. 408, which stand collectively for the proposition that an officer may, for reasons of officer safety, order the driver and passengers to get out of the vehicle during a lawful traffic stop, with *Terry*, 392 U.S. 1, and *Michigan v. Long*, 463 U.S. 1032 (1983), which held that frisks for weapons or searches of the passenger compartment of a vehicle for weapons are justified only if there is a reasonable suspicion that there might be weapons readily accessible on the suspect's person or in the passenger compartment of the vehicle. In light of those authorities, the *Sakyi* Court considered "what justification a police officer must

have to conduct a 'pat-down' for weapons of a passenger in a lawfully stopped vehicle." *Sakyi*, 160 F.3d at 168.

The Fourth Circuit reasoned that *Mimms*, *Wilson*, *Terry*, and *Michigan* "[a]ll . . . recognize generally that every traffic stop poses a meaningful level of risk to the safety of police officers," but that "[o]nly *Mimms* and *Wilson* . . . rely on this generalized risk to justify police action, finding it sufficient justification to order occupants to exit a lawfully stopped vehicle." *Id.* "By contrast, *Terry* and *Long* require a specific, articulable suspicion of danger before police officers are entitled to conduct a 'pat-down.'" *Id.* Synthesizing the Supreme Court case law, the *Sakyi* Court said, *id.* at 168-69 (internal footnote omitted):

> [W]here the intrusion is greater than an order to exit the car, the Court requires commensurately greater justification. Accordingly, in the case before us, we conclude that we may not rely on a generalized risk to officer safety to justify a routine "pat-down" of all passengers as a matter of course. Because a frisk or "pat down" is substantially more intrusive than an order to exit a vehicle or to open its doors, we conclude that *an officer must have justification for a frisk or a "pat-down" beyond the mere justification for the traffic stop*. (Emphasis added.)

The *Sakyi* Court went on to say that the necessary justification "may be satisfied by an officer's objectively reasonable suspicion that drugs are present in a vehicle that he lawfully stops." *Id.* at 169. Observing that "guns often accompany drugs," *id.* at 169,[16] the Court concluded that, "in connection with a lawful traffic stop of an automobile, when the officer has a reasonable suspicion that illegal drugs are in the vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down

---

[16] Although *Sakyi*'s holding is explicitly dependent upon the volatility inherent in the automobile stop context, its rationale that "guns often accompany drugs" would seem to place it in some tension with the Supreme Court's ruling in *Sibron*, *supra*, 392 U.S. 40, that a reasonable suspicion that a suspect is carrying narcotics is not, without more, a basis to conduct a *Terry* frisk.

briefly for weapons to ensure the officer's safety and the safety of others." *Id.*

Defendants rely upon this holding in *Sakyi* to justify the initial pat down of Leftridge and Bishop. *See* Motion at 24-25. As grounds for reasonable, articulable suspicion that "criminal activity was afoot," *id.* at 23, defendants point to the following factors, supported by citations to case law, *id.* at 21, 23-24 (some internal citations omitted):

> While requesting Plaintiff's driver's license and registration, Sergeant Matthews . . . inquired about the purpose of the trip. . . . Plaintiff appeared to Sergeant Matthews to be attempting to speak over Bishop in an effort to control Bishop's responses.
>
> \* \* \*
>
> [T]he traffic stop occurred in the early morning hours at 3:57 a.m. Plaintiff was traveling on Route 13, a known drug trafficking corridor. The time of day and location are both factors which may contribute to reasonable suspicion. [*United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993)]. Plaintiff and Bishop appeared unusually nervous when Sergeant Matthews asked for their identification and for the vehicle registration. Nervousness is another factor which may contribute to reasonable suspicion. *United States v. Newland*, 246 F. App'x 180, 189 (4th Cir. 2007) ("[W]e should not discount [the officer's] ability to ascertain the severity of [the subject's] nervousness in comparison to the behavior of motorists he has encountered in the past."). Plaintiff's and Bishop's conflicting accounts about the purpose of their trip is yet another important factor which may contribute to reasonable suspicion. *United States v. Mason*, 628 F.3d 123, 129 (4th Cir. 2010) *cert. denied*, 132 S. Ct. 329 (U.S. 2011). Sergeant Matthews also noted that the vehicle was not registered to either Plaintiff or Bishop. *Accord Jackson v. State*, 190 Md. App. 497, 519-525, 23, 988 A.2d 1154, 1166-1170 (2010) (finding, among others, the factors of nervousness, location on a known drug corridor, a questionable explanation of the nature of the trip, and the fact that the vehicle was a rental car with out-of-state tags, all were supportive of reasonable suspicion under a totality of the circumstances test).

At this juncture, the facts must be construed in the light most favorable to plaintiff. For instance, Leftridge denies having spoken over Bishop to direct his responses. And, Sgt. Matthews has not specified what "conflicting answers" Leftridge and Bishop allegedly provided. Moreover, with regard to the registration of the vehicle, by the time the pat down was conducted, Matthews had received the results of a license and registration check from dispatch, which

confirmed that the vehicle belonged to Sylvester Bishop, the father of Leftridge and Bishop, and providing no indication of anything extraordinary.

Nevertheless, based on the undisputed material facts, Matthews contemporaneously expressed concern to another officer before the K-9 scan was conducted, as heard on the Video. In particular, he stated, Video at 11:20:

> They seem pretty nervous. They don't have registration for the vehicle, guy says it's his dad's. They say that they're brothers, but there's two different last names. One's from Connecticut, one's from Virginia. They said they were going up, dropping him off at school. I said, which school? He says, oh, I'm not in school yet, I'm going to start school.

Moreover, I may also consider the objective fact that the traffic stop occurred at 4:00 in the morning. And, the officers regarded Route 13 as a corridor for drug trafficking. *See Foreman*, *supra*, 369 F.3d at 785.

As noted, there is no need to determine whether the foregoing facts gave rise to a reasonable suspicion of drug trafficking so as to justify detaining the vehicle until the drug detection dog arrived, because the detention was not prolonged beyond the reasonable scope of a traffic stop in the first place. I also conclude that I need not determine whether those facts gave rise to reasonable, articulable suspicion so as to justify a *Terry* frisk pursuant to *Sakyi*, because even if the facts did not give rise to reasonable, articulable suspicion, that conclusion was not clearly established by the governing law at the time. Accordingly, even if the pat down violated plaintiff's rights, the deputies are entitled to qualified immunity, a defense they assert.

The doctrine of qualified immunity shields government officers from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982); *accord Bland v. Roberts*, ___ F.3d ___, 2013 WL 5228033, No. 12-1671, slip op. at 52

(4th Cir. Sep. 18, 2013). Thus, "officers who commit constitutional violations but who, in light

of clearly established law, could reasonably believe that their actions were lawful" are entitled to

immunity from suit. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc), *cert. denied*,

___ U.S. ___, 132 S. Ct. 781 (2011); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir.

2012). The qualified immunity doctrine helps balance two important interests: "the need to hold

public officials accountable when they exercise power irresponsibly and the need to shield

officials from harassment, distraction, and liability when they perform their duties responsibly."

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The qualified immunity analysis can be separated into two inquiries: (1) whether the facts

alleged, "[t]aken in the light most favorable to the party asserting the injury . . . show the

officer's conduct violated a [federal] right," *Saucier v. Katz*, 533 U.S. 194, 201 (2001); and (2)

whether the right at issue "was clearly established in the specific context of the case—that is,

[whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was

unlawful in the situation he confronted." *Merchant v. Bauer*, 677 F.3d 656, 662 (4th Cir. 2012)

(citation omitted); *see Saucier, supra,* 533 U.S. at 201 (stating that, in conducting the "clearly

established" inquiry, a court must "ask whether the right was clearly established . . . in light of

the specific context of the case, not as to a broad general proposition").

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed

in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt*

*v. Millender*, ___ U.S. ___, 132 S. Ct. 1235, 1245 (2012) (citing *Anderson v. Creighton*, 483

U.S. 635, 639 (1987)). "To be clearly established, a right must be sufficiently clear 'that every

reasonable official would [have understood] that what he is doing violates that right.' In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. ___, 131 S. Ct. 2074, 2078, 2083 (2011)) (some internal quotation marks and citations omitted). "If the law at th[e] time [of the alleged violation] was not clearly established," the official will be entitled to qualified immunity, because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

Of import here, the Supreme Court has made clear that courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, *supra*, 555 U.S. at 236. The *Pearson* Court explained, in part: "There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 237. Put another way, "there will be cases in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all." *Id.* at 239.

In determining whether a right was clearly established, courts in this circuit "'ordinarily need not look beyond the decisions of the Supreme Court, [the Fourth Circuit] [C]ourt of [A]ppeals, and the highest court of the state in which the case arose,'" as of the date of the

conduct in issue. *Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir.) (citation omitted), *cert. denied*, ___ U.S. ___, 131 S. Ct. 392 (2010). In this case, even assuming that plaintiff had a right to be free from a *Terry* frisk in the circumstances presented here, in the light most favorable to plaintiff, that conclusion was not compelled by clearly established law as of December 1, 2008, when the traffic stop occurred. For instance, in *United States v. Foreman*, *supra*, 369 F.3d at 785, the Fourth Circuit held that an officer making a traffic stop had reasonable suspicion of drug trafficking where the driver was stopped at 7:00 a.m., had an "unusual travel plan," had "several air fresheners," "was exceptionally nervous," and was traveling, like plaintiff here, on Route 13, "a frequented corridor for illegal narcotics flowing from New York City and other points north to the Tidewater area of Southeastern Virginia." In *United States v. Brugal*, 209 F.3d 353, 359-60 (4th Cir. 2000) (en banc), the Court determined that an officer had reasonable suspicion of narcotics trafficking where the vehicle was traveling at 3:30 a.m. on "a major thoroughfare for drug trafficking," the driver had a driver's license from a state other than the state where he had rented the vehicle, and his explanation of his itinerary did not make logical sense.

In *Foreman*, moreover, the Court articulated the following standard for reasonable suspicion under the totality of the circumstances: "The articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." *Foreman*, 369 F.3d at 781. Here, the details Sgt. Matthews observed at least arguably raised suspicion and eliminated a substantial portion of innocent travelers. Leftridge and Bishop were traveling at 4:00 a.m. on Route 13 (a highway that the Fourth Circuit case law had described as a corridor for drug trafficking) and several aspects of

their travel plans were unusual, including that they were in a vehicle that was not registered to either of them and was not registered in the same state from which the driver had his license; they claimed to be brothers but had different last names; Bishop's explanation that he was traveling to Connecticut to enroll in school seemed unpersuasive.  I need not reach the question of whether these facts actually gave rise to reasonable suspicion, because a reasonable officer could have concluded that they did in light of then-clearly established law.  Accordingly, defendants are entitled to qualified immunity with respect to the first pat down.

Once the dog alerted, the deputies had probable cause to search the vehicle.  *See, e.g.*, *Florida v. Royer*, 460 U.S. 491, 506 (1983) ("[A] positive result [from a dog] would have resulted in . . . probable cause"); *United States v. Kelly*, 592 F.3d 586, 592 (4th Cir. 2010) (stating that "police had probable cause [to search vehicle] based on the drug detection dog's positive alert"); *Branch*, *supra*, 537 F.3d at 340 n.2 ("[I]t is well settled that a 'positive alert' from a drug detection dog, in and of itself, provides probable cause to search a vehicle.").  And, based on *Sakyi* and the case law already discussed, the deputies' probable cause to believe the car contained controlled substances was sufficient to justify the second pat down of Leftridge and Bishop.

In a final sally with respect to his Fourth Amendment claim, Leftridge argues that the deputies "planted" the marijuana residue that they claimed to have found on the floor of the vehicle.  However, I agree with defendants that, under the circumstances, this allegation is so inherently implausible as to call for summary dismissal under *Aschroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2008).  As defendants point out, it would make no sense whatsoever for a law enforcement officer to plant trace amounts of a

controlled substance in a vehicle subject to a traffic stop, only to let the driver go with a warning to fix his brake lights.

For all of the foregoing reasons, defendants are entitled to summary judgment with respect to plaintiff's Fourth Amendment claim.

## 2. Racial Discrimination

Plaintiff also claims that the deputies discriminated against him on the basis of his race by pulling him over and subjecting him to the events of the traffic stop. In addition to a claim under the Equal Protection Clause of the Fourteenth Amendment, plaintiff asserts a claim under 42 U.S.C. § 1981. In relevant part, that statute provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). I will consider plaintiff's Equal Protection and § 1981 claims together.[17]

Although it does not appear that the Fourth Circuit has squarely addressed the elements of a claim of racial discrimination in traffic stops, Judge William D. Quarles, Jr. of this court recently analyzed this issue in a thorough opinion, drawing on Eighth Circuit and Tenth Circuit

---

[17] In *Gray v. Maryland*, 228 F. Supp. 2d 628, 639 (D. Md. 2002), Judge Blake observed that the "First, Third, and Seventh Circuits have held that § 1981 does reach government misconduct which is based on race," but that the "Fourth Circuit has not yet considered the issue." Relying on *Gray*, defendants argue that § 1981 is primarily directed at racial discrimination in private contracts, and that the viability in the Fourth Circuit of a claim of governmental racial discrimination under § 1981 is unclear. Defendants suggest that "this is not the case upon which to ground a heretofore unrecognized cause of action in the Fourth Circuit." Motion at 31.

In my view, it is appropriate to assume, *arguendo*, that § 1981 applies to racial discrimination by government actors. There is no indication that the relevant substantive standards would differ in any way from a claim under the Equal Protection Clause. For this reason, I will consider the two claims collectively.

precedent. *See Martin v. Conner*, 882 F. Supp. 2d 820 (D. Md. 2012). Judge Quarles observed

that the "Fourteenth Amendment right not to be stopped on the basis of race was clearly

established in 2009." *Id.* at 839. That right was no less well established in December 2008.

In analysis that is illuminating here, Judge Quarles wrote, *id.* at 839-40:

"[E]ncounters with officers may violate the Equal Protection Clause when initiated . . . based on racial considerations." *United States v. Frazier*, 394 F.3d 612, 617 (8th Cir. 2005); *see also Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003). To avoid summary judgment, the burden is on the § 1983 plaintiff "challenging alleged racial discrimination in traffic stops and arrests" to "present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect." *Marshall*, 345 F.3d at 1168.

In *Marshall*, on which [plaintiff] relies, the defendant officer moved for summary judgment on the plaintiff's claim that the officer stopped him on the basis of his race. *Id.* In response, Marshall presented evidence, "disputed, to be sure," that: (1) he did not commit the traffic infraction that was the alleged basis of the stop; (2) the officer knew Marshall's race before making the stop; (3) the officer "made repeated accusations that Mr. Marshall was on crack with no apparent basis"; (4) the officer noted Marshall's race and gender in the "gender" box of the incident report; and (5) the officer's "account of the events changed dramatically between the date of the incident and that date of his affidavit" in Marshall's suit. *Id.* at 1170. The officer offered "no nondiscriminatory explanation" for his actions except to contest that Marshall committed the traffic violation. *Id.*

In light of that showing, the Tenth Circuit concluded that it was "a close question" whether Marshall had presented enough evidence to survive summary judgment, and remanded to the district court for further analysis. *Id.* at 1171. It added that, if accurate, the officer's "extensive alleged [history of] misconduct" (which had led to his termination from another police department) "might raise an inference of racial discrimination . . . or provide evidence that similarly situated individuals of a different race received different treatment." *Id.*

Judge Quarles then catalogued the evidence in the case before him, 882 F. Supp. 2d at

840-41 (internal footnotes omitted):

Martin has identified evidence—much of which is disputed—that: (1) he was not speeding when Sgt. Conner saw him on Interstate 95; (2) Sgt. Conner had

an unobstructed view of Martin as Martin drove by the officer's post on Interstate 95; (3) he did not smell marijuana in the rental car when Sgt. Conner stopped him; (4) although Sgt. Conner claimed that he stopped Martin for speeding, Sgt. Conner did not give Martin a speeding ticket; (5) although Sgt. Conner claimed to smell marijuana in the car, he did not use the K-9 unit called to the scene; (6) Sgt. Conner supervised TFC Gussoni's investigation into reopening the gun charges; (7) that investigation began the day after MSP received Martin's [Public Information Act] request for records related to the December 9 stop; and (8) Sgt. Conner "has a history of stopping and searching a disproportionate number of non-white motorists."

Then, Judge Quarles compared the evidence to the evidence in *Marshall*:

Martin argues that "the evidence establishes that Defendant Sgt. Conner had an opportunity to observe Mr. Martin's race before pulling over" because the black box video shows Martin in the center lane of Interstate 95, without any cars between him and Sgt. Conner, as he passes Sgt. Conner's parked car. Evidence that an officer looked directly at an individual as both were stopped, at a close range, can support an inference that the officer "was ascertaining [the individual's] race." *Marshall*, 345 F.3d at 1169. That scenario does not necessarily lead to the conclusion that Sgt. Conner was able to determine Martin's race as Martin passed by at 60 miles per hour or faster, but a reasonable jury could conclude that Sgt. Conner had the chance to see that Martin was African-American, and that is enough at this stage.

Martin further asserts that, because Sgt. Conner pulled Martin over about two miles past the point where Martin passed Sgt. Conner, Sgt. Conner "did not decide to pursue and stop Mr. Martin until he had a chance to observe Mr. Martin's race." That Sgt. Conner did not activate his emergency lights or begin to follow Martin until Martin had passed him (the moment at which Sgt. Conner allegedly had the opportunity to determine Martin's race), does not, alone, create an inference that he decided to make the stop based on Martin's race. In *Marshall*, the evidence showed that the defendant officer saw Marshall fail to stop at a stop sign, then, several blocks after the traffic violation, pulled next to Marshall at a stop, looked at Marshall's face, and moments later activated his emergency lights. *Id.* The sequence of events—that the officer, who was following Marshall before the violation, observed the violation, continued to follow Marshall without signaling him to pull over, determined that Marshall was African-American, then pulled him over, would permit a jury to reasonably infer that Marshall's race "played a part in the decision to initiate the stop." *Id.* Here, by contrast, Martin has not shown that Sgt. Conner observed the alleged traffic violation before he had the opportunity to see that Martin was African-American. Thus, there is no evidence that, before realizing that Martin is African-American,

Sgt. Conner had reasonable suspicion to stop him but chose not to, as there was in *Marshall*.

*    *    *

The evidence in *Marshall* was "close"; the evidence here is closer. *See Marshall*, 345 F.3d at 1170. Martin has not offered evidence that Sgt. Conner explicitly accused him of criminal activity based on racial stereotypes, blatantly checked Martin's race before deciding to pull him over, changed his story of the events leading to the stop, or had an "extensive" disciplinary record that included termination for misconduct. *Id.* at 1169-71. However, Martin need not provide overwhelming evidence—he must only show that a reasonable jury could conclude that a violation occurred. Viewing the evidence in the light most favorable to Martin, a reasonable jury could conclude that Sgt. Conner saw that Martin was African-American, then decided to pull him over. Summary judgment is inappropriate.

*Martin*, 882 F. Supp. 2d at 840 n.22 & 841 (some internal citations omitted).

Here, Sgt. Matthews denies being aware of Mr. Leftridge's race until after he pulled Leftridge over, but the Video permits the opposite inference to be drawn: the Video shows that Matthews' vehicle pulled alongside Leftridge's vehicle momentarily, before merging behind it and initiating the traffic stop. Leftridge argues that Matthews saw him at that time and was aware of his race.

Although this case, *Martin*, and the Tenth Circuit's case in *Marshall* all involve factual scenarios by which the defendant officer could have known the plaintiff's race before initiating a traffic stop, that is where the similarity ends. Critically, unlike *Marshall* and *Martin*, there can be no genuine dispute that Leftridge committed the traffic infraction for which he was pulled over—despite Leftridge's protestations, the Video clearly shows it. Moreover, there is no evidence that any of the deputies in this case said or did anything during the encounter that would give any outward appearance of racial bias or an ulterior motive for their actions. Unlike *Marshall* and *Martin*, there are no unexplained discrepancies in the deputies' conduct, nor did any of the deputies make seemingly off-topic comments with racial overtones. The Video does

not show such conduct, nor does plaintiff even allege that it occurred. Indeed, plaintiff has not advanced any evidence, nor has he even provided any allegations rising above the conclusory, that any of the defendant deputies has a documented history of racially motivated or otherwise questionable conduct.

In sum, the only facts on which Leftridge builds his claim are that he is black, the defendants are white, and Matthews observed that Leftridge was black before he stopped Leftridge. The Tenth Circuit ruled that the circumstances in *Marshall* were "close," and Judge Quarles remarked that the circumstances in *Martin* were "closer." This case is not even in the ballpark. "If a reasonable jury could reach only one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture, judgment as a matter of law must be entered." *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005). Defendants are entitled to judgment as a matter of law with respect to plaintiff's claims of racial discrimination.

### Conclusion

Mr. Leftridge and his brother are understandably upset by their experience on December 1, 2008. Many law abiding people would feel violated at having to endure a frisk, a drug dog scan, and a search of one's vehicle in the middle of the night on the side of a highway. And, I recognize that Mr. Leftridge suspected a racial motive for the traffic stop. But, a lawsuit must be built on fact and not suspicion. In this case, the undisputed material facts compel judgment in defendants' favor as a matter of law. An appropriate Order follows.

Date:   September 30, 2013            _____/s/_____
                                             Ellen Lipton Hollander
                                             United States District Judge